FILED

11/23/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0066

DA 20-0066

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 303

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

MICHAEL JOSEPH McCOY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. DDC 18-709
Honorable John W. Parker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Kristina L. Neal, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

          Joshua A. Racki, Cascade County Attorney, Susan Weber, Stephanie Fuller,
Deputy County Attorneys, Great Falls, Montana

Submitted on Briefs:  October 27, 2021

Decided:  November 23, 2021

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Michael Joseph McCoy (McCoy) was convicted in the Eighth Judicial District Court, Cascade County, of Criminal Distribution of Dangerous Drugs, § 45-9-101, MCA, and Endangering the Welfare of a Child, § 45-5-622(3)(c), MCA.  He appeals his drug offense conviction, contending the State presented insufficient evidence for the jury to find him guilty.  He also asserts the District Court deprived him of his right of allocution during his sentencing hearing.

¶2    We restate the issues as follows:

1.  *Did the State present sufficient evidence for the jury to convict McCoy of criminal distribution of dangerous drugs?*

2.  *Did the District Court deny McCoy an opportunity for allocution at his sentencing hearing in violation of § 46-18-115, MCA, and his right to due process?*

¶3    We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**McCoy's Charges and Jury Trial**

¶4    L.B., a minor, lived with defendant McCoy in his Great Falls home as a baby when his maternal grandmother, Mary Marceau (Marceau), was in a relationship with McCoy, who L.B. grew up calling "Grandpa."[1]  When L.B. was about two years old, Marceau and McCoy parted ways, and for a long period thereafter L.B. lived separately with Marceau,

---

[1] L.B. testified that he called McCoy "Grandpa" when he was young, and that McCoy was "like a grandpa" to him.  Throughout his testimony he referred to McCoy as "Mike."  McCoy described his relationship to L.B. as "step-grandfather."

who acted as his guardian. Nancy Brown (Brown), who is L.B.'s mother and Marceau's daughter, also lived in McCoy's home as a teenager and grew up knowing McCoy as her stepfather. Brown had a long-term struggle with drug addiction, primarily using heroin but also methamphetamine (meth). Due to Brown's addiction and lifestyle, Marceau prohibited Brown from living with her and L.B. However, McCoy allowed Brown to move back into his home in 2015.

¶5 Brown testified that when she returned to live with McCoy, McCoy and his house had drastically changed from the time she lived there growing up. She remembered him previously as being "strict," but by 2015, "He was the total opposite. Everything that he would . . . get mad about me or talk about me doing, he was doing. I mean, I was shocked." What McCoy had started "doing" was using drugs. "[H]e was too nice of a person letting people walk all over him. He was losing his things," Brown said. "[H]e was going about everything the wrong way. We all were, because of drugs." Living with McCoy facilitated Brown's drug addiction. In 2017, L.B. was thirteen years old and living with Marceau only a block from McCoy's house, with Brown occupying McCoy's basement.

¶6 In August 2018, a detective conducted a forensic interview with L.B. at the Child Advocacy Center. L.B. told the detective that McCoy exposed him to and provided him with meth between June 2017 and September 2018, during which time he was a regular visitor to McCoy's home. Detective Robert Lopez (Lopez) observed the forensic interview with L.B., and thereafter visited with Brown, who was then attending an addiction treatment center, about L.B.'s allegations, which she confirmed. In October 2018, McCoy

was arrested and charged with Criminal Distribution of Dangerous Drugs, a felony (Count 1), and Endangering the Welfare of a Child, a felony (Count 2).[2] Brown was also charged as McCoy's co-defendant.

¶7 At McCoy's jury trial, L.B. testified that the first time he returned to McCoy's home as a teenager in 2017, he was attempting to visit Brown, but surprised her and her boyfriend in the basement as they were about to shoot up heroin. L.B. left the basement, went upstairs, and reunited with McCoy, who he found sitting in his favorite chair in the living room with several guests. The guests were sitting on couches passing around a meth pipe, but L.B. did not see McCoy smoke at this time and did not then participate in the drug use. After L.B., thirteen years old and in seventh grade, had been going to McCoy's house almost daily after school for a period of six months, a guest there showed him how to smoke meth and he used the drug for the first time. Thereafter, L.B. began smoking meth regularly at McCoy's home. L.B. testified concerning the first time he smoked with McCoy: "I just asked him [(McCoy)] if I could see his pipe. And I loaded it, handed it back to him, and then we just passed it around." L.B. testified that McCoy's pipe or "loke" was clear-colored, "long glass, ball at the end, hole on top of the ball."

¶8 L.B. identified McCoy's favorite chair and the surrounding couches in the State's photo exhibits and testified that McCoy sat in his chair "[a]ll the time. That was his chair."

---

[2] The State originally charged McCoy with Criminal Child Endangerment under § 45-5-628(1)(d), MCA, as an alternative charge in Count 1. The State dropped this alternative charge at the close of its case-in-chief during trial.

L.B. testified McCoy would sit in the chair when they smoked meth together. For a period of three to four months, McCoy and L.B. smoked together "at least twice a day," always loading and passing McCoy's clear pipe between them. L.B. described the substance they smoked as "crystals" or "powder," and that it was stored in "baggies." L.B. testified that there were other people at McCoy's house continuously, and that he was present while McCoy sat in his chair with up to six other people on the surrounding couches in the living room smoking meth. The State inquired further about McCoy's house guests:

> Prosecutor: Where did the drug use come in? Were they there –
>
> L.B.: – they were there for a spot to, you know, hang out for a little bit and for them to hang out there that would, you know, get them high.
>
> Prosecutor: So it was kind of like a – was it a safe house where you –
>
> L.B: Yeah.
>
> Prosecutor: – could go and use your drugs?
>
> L.B.: Yeah.
>
> Prosecutor: Did [McCoy] have any specifications about the people that he let into the house?
>
> L.B: No.
>
> Prosecutor: So he would just let anybody in?
>
> L.B: Oh. Well, not really anybody. Maybe if – it would be my mom's friends or just his friends, yeah. But not just anybody would just go over there. It was people he knew.

¶9     When he smoked meth, L.B. reported feeling "good," "more awake," "like [he] could do anything [he] wanted." McCoy suffered from persistent hip pain and other health issues, but L.B. testified that, when McCoy smoked, he "wouldn't be sick [any] more. He'd

5

be normal, sitting in his chair. He'd be good." L.B. testified, "Every time I had [meth], and if [McCoy] was sick, I would ask him if he wanted to smoke." There were drugs at McCoy's home "most of the days" L.B. was there, and when he did not get meth from McCoy, he bought it with money he obtained through stealing. However, he consistently took the drugs to McCoy's house to use.

¶10    L.B. testified to feeling scared when the police would show up at McCoy's house with warrants looking for people, and sometimes arrest other house guests while L.B. was present. He reported that "a lot [of the people at McCoy's house] always went to jail." He felt like he needed to act "like an adult" and "like someone [he] wasn't" while at McCoy's house because he was surrounded by older people and drug users. On three to five occasions he acted as a "middleman" between McCoy and his teenage friends, exchanging their money with McCoy for meth. L.B. recounted one occurrence when his friend gave him ten dollars to give to McCoy, who in return gave the teenagers his pipe loaded with meth and instructed them to smoke it in the bathroom.

¶11    L.B. testified McCoy never asked him or any of his guests to leave, and that he and Brown were the ones to require that people leave when McCoy fell asleep in his chair, "so nobody stole [his] stuff or went through [his] stuff while he was sleeping." L.B. also testified that, after "essentially living there" for weeks at a time, he would sometimes "get kicked out," but "[he'd] always be able to come back." When questioned by the defense, L.B. denied that McCoy ever asked him not to come to his house, clarifying that he only "snuck in" when bringing other kids over to hang out in the basement. He acknowledged

6

his mother, Brown, asked him not to hang around the house and the people there, but that he did not obey her "[b]ecause I didn't care at the moment. I was under the influence, and I just didn't care."

¶12 Brown testified after L.B. At the time of trial, she was still a charged co-defendant with McCoy and incarcerated at the Cascade County Detention Center.[3] Brown testified L.B. had been "coming around" McCoy's home when she was living in his basement in 2017 and 2018. She worried about L.B. being in that environment, but her own drug use impeded her ability to direct her son:

> [L.B.] needed to be out of there, and I told him he needed to. But then again, when he needed a place to stay, I let him come there. I would never push him away or whatever. I knew it was bad for him . . . Also, other times too, when he was in the house, like, I was downstairs, he'd be upstairs. I didn't have no control. I know we didn't want him there, but he was there.

Brown testified she overheard McCoy telling L.B. that he did not want L.B. "hanging around at the house." She had spoken with McCoy, and they agreed his home was a dangerous place for L.B. However, they both still allowed him to be there and to associate with drug users and dealers.

¶13 Brown confirmed that McCoy spent his time upstairs on the main floor, primarily in his favorite chair in the living room, where he would eat, sleep, and smoke meth. She believed he spent most of his time there due to a broken hip. When asked how often she

---

[3] Prior to McCoy's trial, Brown had pled guilty to the distribution of dangerous drugs charge and was awaiting sentencing. L.B. was in custody at the Juvenile Detention Center for unrelated drug charges, and he was scheduled to enter chemical dependency treatment following the trial. Brown and L.B. both received immunity for their testimonies against McCoy, but the record does not indicate whether their sentences were impacted by their cooperation.

saw McCoy smoking meth in the house, Brown answered, "A lot. Almost every other day. A lot." Brown also testified other people were often in the house. According to Brown, they were:

> Our friends. Bad people. People that needed a place to stay. People that needed to make our house a pitstop. They were on drugs. Sometimes wanted from the cops and just needed a place to – for a pitstop. And that was it. That was just the spot for them to, you know, to be and to hide and to whatever.

Brown recalled times the house was raided by the Drug Task Force, and that "wanted" people had been arrested there.

¶14 Brown became aware in 2017 that L.B. was using meth by "the way he was acting" and the "people he was hanging around with"— "older people that [she] knew that were in the drug scene." Brown testified that she never actually saw McCoy give L.B. drugs or smoke meth with him and did not see L.B. use drugs at McCoy's home, but stated she knew her son was using and was suspicious because "[she] would come upstairs and [L.B.] would be up there with known drug users and [McCoy]."

¶15 Detective Lopez testified he had worked on the Drug Task Force for the Great Falls Police Department for thirteen years, and offered testimony about the effects of meth use, stating it "impairs people's judgment when it comes to just rational thought, people become aggressive, they'll do things that they normally wouldn't do when it comes to crime . . . work ethic, school." Lopez was familiar with McCoy and his home, having visited the house for multiple drug investigations, and having served multiple search warrants at the residence. At one point, he and his partner had to "run down a federal fugitive who was at the house." Lopez explained that local police considered McCoy's home a "drug house, a

flop house, a house that people would frequent." Neighbors "constantly call[ed] [the Drug Task Force] demanding that [they] take action, because [the neighbors] were tired of all the high traffic activity outside the house." Lopez recalled he had been to the house "many times" and had often seen people on the couches. Commonly coming and going from the residence were people he had contact with through drug investigations, "people immersed in the drug culture." Although he never witnessed people dealing drugs or doing drugs at McCoy's house, Lopez found drugs and drug paraphernalia inside the house during a prior, unrelated police search.

¶16    Lopez testified that, sometime after he had interviewed Brown at the drug treatment center, she contacted him and asked him to advise McCoy that she had been hospitalized for surgery. Lopez and his partner went to McCoy's house and related this news. They also asked McCoy about L.B.'s report that McCoy had provided meth to him. Lopez testified that McCoy denied giving drugs to L.B., but that he acknowledged that, although L.B. was supposed to be living with his grandma, L.B. essentially lived at McCoy's home during the time when L.B. alleged he had provided him with meth. McCoy "agreed that [L.B.] was out of control, was being negatively affected by the lifestyle in the house . . . . was a meth user and a heroin user and a marijuana user." McCoy expressed concern to Lopez that L.B. "was getting wrapped up in the gangster-style culture that people brought to the house." McCoy admitted to being a drug user himself, and that other people did drugs in his home.

¶17 McCoy testified in his own defense. He confirmed L.B. had lived with him and Marceau as a baby, but that the teenage L.B. "was not allowed to live with [him]," and he had told L.B. repeatedly he was not welcome at his house. Despite this instruction, McCoy admitted "it was so difficult to say no to [L.B.], to keep a child from seeing his mother," and thus, "I allowed him to stay." McCoy admitted to being a "casual" meth user, smoking the drug from a clear, glass pipe while sitting in his living room chair. Around 2015, he had started "experimenting" with the drug to ease his pain following a hip replacement. He confirmed that L.B. had become a "pretty regular visitor" by 2017, and McCoy admitted to smoking meth in the house during that time, though denied ever providing L.B. with drugs.

¶18 McCoy explained he sat in his favorite chair in the living room because of his limited mobility from a hip condition, and "so [he] could monitor what's going on in [his] house . . . any robbery or thieving going on . . . watch the door and then also. . . the people that [came] in." McCoy said L.B. would sometimes enter through the back door, which was not visible from McCoy's chair, and go straight to the basement to see his mother, "completely avoid[ing]" McCoy: "[H]e was there to visit his mother, not me." McCoy also alluded to L.B. stealing from him and mentioned L.B. had been arrested at his house for truancy.

¶19 McCoy agreed his house had become "a place where drug users would hang out," use meth and conduct drug deals, but he felt like he "got overran by [Brown's] friends." McCoy stated: "I got took over . . . I didn't want any drugs going on in my house or drug

dealing going on my house, but it occurred . . . it was hidden from me." According to McCoy, Brown's addict friends would not use drugs in the living room with him or on the couches, but rather use meth and heroin in the basement with Brown, concealing their activities from him. McCoy estimated fourteen people had been arrested at his house, with seven being arrested at one time for outstanding warrants.

¶20    The jury found McCoy guilty of both charged offenses.

**McCoy's Sentencing Hearing**

¶21    At McCoy's sentencing hearing, following the State's witness, McCoy's counsel informed the court that McCoy would present no witnesses. The District Judge then stated:

> THE COURT: All right. Did you[r] client wish to address the [c]ourt?
>
> DEFENSE: I believe he would like to address the [c]ourt at some point, yes, Judge.
>
> THE COURT: All right. I'll leave it to you whether that'd be before or after your argument. I have reviewed the sentence memoranda of the parties. I found them very helpful in framing your positions heading into this argument.

¶22    The State recommended a ten-year prison sentence with five years suspended for Count 1, and a five-year sentence with no time suspended for Count 2. McCoy's counsel then presented his argument, emphasizing that Brown and L.B. were responsible for their own actions and focusing on McCoy's minimal criminal record, health concerns, and age.[4] He asked for community placement and chemical dependency evaluation and treatment for McCoy. In the alternative, he asked for a seven-year Department of Corrections

---

[4] McCoy was 62 years old at the time of sentencing.

commitment with four years suspended. The State responded in rebuttal to clarify a few points.

¶23 The District Court then explained to the parties his considerations for sentencing, noting "there's a difference between doing well on supervision and doing well as an unfettered citizen in the community. I think this record shows he can do well on supervision. He cannot do well without some oversight." The court expressed particular concern about the amount of criminal activity McCoy allowed to take place in his home and its effect on the community. The District Court sentenced McCoy to a fifteen-year prison sentence with ten years suspended for Count 1, and a five-year prison sentence with no time suspended for Count 2, to run concurrently.

¶24 The District Court then asked, "are there any additional findings, conclusions, or order you'd have me make on this record today?," first to the prosecutor, and then to the defense. McCoy's counsel replied, "No, Your Honor. Thank you." Lastly, the court addressed McCoy personally regarding the sentence it was imposing and the consequences of future criminal behaviors. McCoy replied, "Yes, Your Honor," which concluded the hearing.

## STANDARDS OF REVIEW

¶25 We review the question of whether sufficient evidence supports a criminal conviction de novo. *State v. Burwell*, 2013 MT 332, ¶ 6, 372 Mont. 401, 313 P.3d 119 (citation omitted). We consider the evidence presented in the light most favorable to the prosecution, and we will uphold a conviction where "any rational trier of fact could have

found all the essential elements of the offense beyond a reasonable doubt." *Burwell*, ¶ 6 (citations and internal quotations omitted).

¶26 This Court reviews criminal sentences for legality, and "[w]e review de novo whether a district court violated a defendant's constitutional rights at sentencing." *State v. Keefe*, 2021 MT 8, ¶¶ 10-11, 403 Mont. 1, 478 P.3d 830 (citation omitted). We review questions of statutory interpretation de novo. *State v. Payne*, 2021 MT 256, ¶ 14, 405 Mont. 511, 496 P.3d 546 (citing *Sartain v. State*, 2017 MT 216, ¶ 9, 388 Mont. 421, 401 P.3d 701).

## DISCUSSION

¶27 *1. Did the State present sufficient evidence for the jury to convict McCoy of criminal distribution of dangerous drugs?*

¶28 Due process requires that the State prove each element of a charged offense beyond a reasonable doubt. *State v. Christensen*, 2020 MT 237, ¶ 118, 401 Mont. 247, 472 P.3d 622. "[A] person commits the offense of criminal distribution of dangerous drugs if the person sells, barters, exchanges, gives away, or offers to sell, barter, exchange, or give away any dangerous drug, as defined in 50-32-101." Section 45-9-101, MCA. Meth is classified as a Schedule II dangerous drug under § 50-32-224(3)(d), MCA.

¶29 McCoy's argument focuses on whether the State presented sufficient evidence at trial to prove beyond a reasonable doubt that the substance L.B. claimed McCoy provided to him was in fact meth.[5] McCoy asserts the evidence was insufficient because the State

---

[5] McCoy's briefing does not challenge the sufficiency of the evidence supporting his conviction for Endangering the Welfare of a Child, or otherwise challenge it, and we do not address it.

failed to present any medical or expert testimony regarding the substance, L.B. was the only witness who testified to seeing the substance in question, and the substance itself was never obtained or tested by law enforcement.

¶30    "When sufficiency of the evidence is challenged, it is our job as an appellate court to probe the record for evidence to support the fact-finder's determination." *State v. Dineen*, 2020 MT 193, ¶ 14, 400 Mont. 461, 469 P.3d 122 (quoting *Murray v. Whitcraft*, 2012 MT 298, ¶ 26, 367 Mont. 364, 291 P.3d 587). Our only task is to determine if the verdict is supported by substantial evidence. "A verdict based on substantial evidence will not be disturbed on appeal." *State v. Salois*, 235 Mont. 276, 281, 766 P.2d, 1306, 1310 (1988). "Substantial evidence is evidence that a reasonable mind might accept as sufficient to support a conclusion." *State v. Henrich*, 268 Mont. 258, 268, 886 P.2d 402, 408 (1994). Although evidence of testing of a suspected substance is preferred, "[t]he failure to have a suspected drug substance tested by the state crime lab does not always render the evidence insufficient to support a conviction." *Burwell*, ¶ 8 (citing *Salois*, 235 Mont. at 279-80, 766 P.2d at 1309). A jury may consider all direct and circumstantial evidence, as well as any legitimate inferences that may be legally drawn from the evidence. *Christensen*, ¶ 118. Direct "[t]estimonial proof of possession of a dangerous drug is sufficient to sustain a conviction." *State v. Hull*, 158 Mont. 6, 18, 487 P.2d 1314, 1321 (1971). "[C]ircumstantial evidence may [] support the conclusion that a substance is a dangerous drug." *Burwell*, ¶ 8; *Henrich*, 268 Mont. at 269, 886 P.2d at 409 (citing *State v. Dunn*, 155 Mont. 319, 472 P.2d 288 (1970)). "A single witness' testimony is sufficient to prove a fact, and the State

14

may use circumstantial evidence to prove any element of an offense." *State v. Kaske*, 2002 MT 106, ¶ 25, 309 Mont. 445, 47 P.3d 824 (citation omitted). "[D]eterminations of the credibility and weight of testimony are within the exclusive province of the jury, and conflicting testimony does not render the evidence insufficient to support a guilty verdict." *State v. Wood*, 2008 MT 298, ¶ 43, 345 Mont. 487, 191 P.3d 463. (Internal quotations and citations omitted).

¶31 Cases involving the identification of a drug substance not tested by law enforcement are fact specific. In *Dunn*, the defendant provided a teenage girl with LSD pills which she ingested with her friend. *Dunn*, 155 Mont. at 321, 472 P.2d at 290-91. Although the pills themselves were already ingested, and thus unavailable to law enforcement, we reasoned the unavailability did not render the evidence insufficient. At trial, both teenagers testified in detail about their experiences hallucinating after ingesting the pill. *Dunn*, 155 Mont. at 332, 472 P.2d at 296. The teenagers were high in the presence of their parents who corroborated the drug's effect: One father "described his daughter as being completely disoriented, wandering off in her conversation, laughing, crying, and uncontrollably shaking." *Dunn*, 155 Mont. at 333, 472 P.2d at 296. The second father, a physician, gave his medical opinion that, based on his observations of his daughter, the pills ingested were "[LSD] or one of the hallucinatory drugs . . . but without a chemical analysis he could not be certain of the derivative of the drug." *Dunn*, 155 Mont. at 333, 472 P.2d at 297 (internal quotation omitted). We affirmed the conviction, concluding there was "substantial credible evidence to support the jury verdict." *Dunn*, 155 Mont. at 335, 472 P.2d at 298.

15

¶32 In *Henrich*, we reversed the defendant's conviction for endangering the welfare of a child by allegedly providing his daughter with meth. We found the evidence to be insufficient and distinguished the facts from *Dunn*:

> [T]he circumstantial evidence in this case was not sufficient to establish Henrich was guilty of the charged offense. [The minor victim's] unqualified opinion is insufficient to establish that the alleged drug was methamphetamine. The State did not introduce a bottle of the pills, any analysis of the pills, or any expert analysis of [the victim's] reaction to the pills. Her testimony that she shook, was wide awake, and that her hair tingled from ingestion of the substance was not supported by other testimony, as in Dunn.

*Henrich*, 268 Mont. at 269-70, 886 P.2d at 409.

¶33 In *Burwell*, the State brought charges after a woman in detention alleged that a "man whose name she could not remember" gave her marijuana in exchange for babysitting. She gave a "vague physical description" of the man and the location of his house, and the police used her description of the defendant's residence and the fact that Burwell had a medical marijuana card to identify and arrest Burwell for criminal distribution of dangerous drugs. *Burwell*, ¶ 3. At trial, the woman testified she had "'smoked a bowl'" of marijuana with Burwell, and that he gave her a baggie with a substance she described as "'green with orange hairs,'" identifying the substance as marijuana because she had smoked the drug before. *Burwell*, ¶ 4. In reversing the conviction, we noted that:

> [u]nlike in *Dunn*, no expert witness analyzed [her] description of the substance; no additional lay witnesses corroborated her testimony; and she did not describe the effects of the substance, the duration of those effects, or the amount of the substance she ingested . . . . She did not describe the characteristic leaf or aroma of marijuana. She did not even testify that she got high from smoking it.

16

*Burwell*, ¶ 18.

¶34  While there was no testing of the substance McCoy allegedly gave L.B., the quality and quantity of the evidence about the substance presented at McCoy's trial exceeds that found to be deficient in *Henrich* and *Burwell*. L.B.'s extensive direct testimony provided the jury with the time, place, context, individual identifications, activities, and effects of the alleged drug use, in support of the charge. He testified in detail about smoking meth with McCoy—for several months "at least two times a day" in McCoy's living room with McCoy in his signature chair, loading McCoy's clear pipe, and sharing the pipe between them. Brown and McCoy corroborated that this was exactly how McCoy smoked his meth. Further, Brown and McCoy corroborated L.B.'s testimony about McCoy's health problems and how McCoy would use meth to alleviate his medical symptoms. L.B. testified he would suggest they smoke together when McCoy was sick, and that after smoking, McCoy would again be "normal." McCoy admitted he used meth to self-medicate. L.B. described the physical characteristics of the drug as crystals or powder, and the method they used to smoke meth, testifying that McCoy called his pipe a "loke."

¶35  Every witness testified to L.B.'s consistent presence in McCoy's residence and the common presence of meth in the home during the period covered by the charges. Every witness also testified that McCoy's home was a place where drug users gathered, traded for drugs, used drugs, and hid from law enforcement. McCoy, Brown, and L.B. testified that McCoy was concerned about items being stolen from the home by visitors. McCoy and Brown admitted that, despite their concerns, they allowed L.B. to continue frequenting

17

McCoy's home. According to witnesses, meth was a dominant drug found in McCoy's house, and it was his admitted drug of choice. Lopez did not testify as an expert witness but had thirteen years of training and experience policing drugs, including being meth lab certified, and he testified about effects of meth use consistently with L.B.'s reported experiences, as well as McCoy's and Brown's observations of L.B. *See Burwell*, ¶ 8 ("the testimony of witnesses experienced in identifying dangerous drugs may provide sufficient evidence to support a conviction"); *Wood*, ¶¶ 39-41 (testimony of officers experienced in recognizing individuals under the influence of drugs regarding defendant's behavior found to be sufficient for conviction). Testimony at trial revealed that L.B. turned to stealing to obtain money to buy drugs and was arrested for truancy at McCoy's house, which a rational juror could infer were behaviors influenced by drug use.

¶36 L.B. was the only witness to directly testify that McCoy provided him with meth, but the jury was properly instructed: "The evidence presented by one witness whom you believe is sufficient for the proof of any fact in this case." *See Hull*, 158 Mont. at 18, 487 P.2d at 1321; *Kaske*, ¶ 25. Much of L.B.'s testimony was corroborated by McCoy, and a rational juror could choose to believe L.B.'s testimony over conflicting portions of McCoy's testimony. The task of determining witness credibility and weighing testimony resides with the jury. *See Dunn*, 155 Mont. at 334, 472 P.2d at 297 ("In our view the conflicting testimony was evaluated by the jury which placed more weight and credence on the testimony of the state's witnesses and by its verdict determined that the charge against the defendant had been proven beyond a reasonable doubt.").

¶37 Much of the testimony was detailed and corroborated by more than one witness, including that McCoy and L.B. were meth users, meth was consistently present and smoked in McCoy's home, and that the users experienced its effects, explained generally by Detective Lopez. A rational juror could believe L.B.'s claim that McCoy provided him meth. We conclude the State presented sufficient evidence to support the jury's determination that McCoy provided L.B. with meth in violation of § 45-9-101, MCA.

¶38 *2. Did the District Court deny McCoy an opportunity for allocution at his sentencing hearing in violation of § 46-18-115, MCA, and his right to due process?*

¶39 Due process rights under the Montana and United States Constitutions apply at sentencing hearings. *State v. Webber*, 2019 MT 216, ¶ 10, 397 Mont. 239, 448 P.3d 1091 (citing *State v. Webb*, 2005 MT 5, ¶ 18, 325 Mont. 317, 106 P.3d 52. "Under the due process guarantee, a defendant must be given an opportunity to explain, argue, and rebut 'any information that may lead to a deprivation of life, liberty, or property.'" *Webber*, ¶ 10 (quoting *Webb*, ¶ 19). "[I]t is the careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by services which counsel would provide, that renders the proceedings lacking in due process." *Webb*, ¶ 19 (quoting *State v. McLeod*, 2002 MT 348, ¶ 19, 313 Mont. 358, 61 P.3d 126) (internal quotations and citations omitted). "Specifically, the right of allocution 'contemplates an opportunity for the defendant to bring mitigating circumstances to the attention of the court.'" *Boardman v. Estelle*, 957 F.2d 1523, 1526 (9th Cir. 1992) (quoting *Sherman v. United States*, 383 F.2d 837, 839 (9th Cir. 1967)).

19

¶40 McCoy argues that the District Court violated the sentencing statutes and his right to due process by failing "to provide him an opportunity for allocution." McCoy argues the District Court "had a statutory and constitutional duty to address [McCoy] personally. The court's failure to do so renders [his] sentence illegal and unconstitutional." McCoy asks that his sentence be vacated, and a new sentencing hearing conducted before a new judge. The State argues McCoy failed to avail himself of the opportunity given at sentencing, the issue was not preserved and is therefore unreviewable, and he was not prejudiced in any way, given his provision of a "Defendant's Statement" in his memorandum filed for the sentencing hearing.

¶41 The State is correct that McCoy failed to preserve the issue, and even if we reviewed the matter as an issue of constitutional law to ensure McCoy's substantial rights were not affected, *see Mont. v. Abel*, 2021 MT 293, ¶ 4, ___ Mont. ___, ___ P. 3d ___, we would conclude there was no error requiring reversal. Section 46-18-115(3), MCA, provides:

> [T]he court shall address the defendant personally to ascertain whether the defendant wishes to make a statement and to present any information in mitigation of punishment or reason why the defendant should not be sentenced. If the defendant wishes to make a statement, the court shall afford the defendant a reasonable opportunity to do so.

¶42 McCoy inaccurately characterizes the record by claiming the District Court failed to address him personally or did not allow him to make a personal statement to the court. The court asked counsel if McCoy wished to address the court, to which counsel answered, "I believe he would," and the court said it would leave the timing of McCoy's statement to

counsel. After the parties' presentations, the court extensively outlined its sentencing considerations, during which it engaged both parties with questions, and ultimately pronounced sentence. The court then asked each side if they had "any additional findings, conclusions, or order you'd have me make on this record today?," to which both sides answered negatively. The court concluded the hearing by further addressing McCoy personally about his future success.

¶43 While it would have been beneficial for the District Court to affirmatively ask McCoy again if he still wanted to make a statement, we cannot conclude on this record that the court violated the statute or McCoy's due process rights. The District Court asked and ascertained whether McCoy wanted to make a statement, and directed counsel to decide the timing of the statement, for which there were various, and thus reasonable, opportunities to do so during the hearing. Fortunately, McCoy's counsel provided a sentencing memorandum with McCoy's "Defendant's Statement," and made argument regarding factors mitigating the sentence, wherein he emphasized that responsibility rested primarily on Brown and L.B. He emphasized McCoy's health concerns. The purpose of allocution, to provide "opportunity for the defendant to bring mitigating circumstances to the attention of the court," was thus fulfilled in these ways. *Boardman*, 957 F.2d at 1526 (quoting *Sherman*, 383 F.2d at 839).

¶44 Affirmed.

/S/ JIM RICE

21

We concur:

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA