DA 11-0749

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 298

TYSON MURRAY,

       Plaintiff and Appellant,

  v.

KYLE DEAN WHITCRAFT,

       Defendant and Appellee.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DV-10-95
Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Nathan J. Hoines, Eric Biehl, Hoines Law Office, PC,
              Great Falls, Montana

       For Appellee:

              Paul R. Haffeman, Davis, Hatley, Haffeman & Tighe, P.C.,
              Great Falls, Montana

Submitted on Briefs:  October 17, 2012

Decided:  December 19, 2012

Filed:

_____
                      Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 On October 17, 2006, Tyson Murray was a passenger in a car driven by Kyle Dean Whitcraft. Whitcraft lost control of the vehicle, causing a single vehicle collision in which Murray was injured. Murray filed a complaint against Whitcraft seeking damages for injuries allegedly caused by Whitcraft's negligence. Following a three-day jury trial in August 2011, the jury returned a verdict in favor of Murray and awarded him $27,000. The sole issue on appeal is whether the District Court abused its discretion in denying Murray's motion for a new trial. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On October 17, 2006, Whitcraft was driving back to Jamestown College in North Dakota accompanied by two college acquaintances, Kyle Rector and Tyson Murray. All three young men lived in either Lewistown or Great Falls, Montana, and they had traveled home together for a long weekend. Shortly after leaving Lewistown, Whitcraft lost control of the vehicle on the icy road and struck the guardrail several times. The impact of the vehicle on the guardrail injured both passengers and totaled Whitcraft's vehicle. Whitcraft's father picked up the young men and returned them to Lewistown where Rector and Murray visited the emergency room. Murray was diagnosed with probable neck and right shoulder strain or contusion. Whitcraft subsequently admitted to being legally responsible for the accident.

¶3 Murray, an excellent student, was attending Jamestown College with assistance from an annual financial aid package of nearly $7,000, which included a $500 baseball scholarship. Upon returning to Jamestown, he informed his coach and trainer of the

2

accident and immediately began sports rehabilitation. Despite attempts to rehabilitate his shoulder, Murray was unable to play baseball for the rest of the semester. After experiencing no substantial improvement by January 2007, Murray withdrew from Jamestown College and returned to live with his parents in Great Falls, where he continued to take classes at a local college while undergoing treatment for his shoulder. Despite an open offer from the college, Murray did not return to Jamestown as his injury did not resolve and he was not able to play baseball anymore. He underwent chiropractic treatment until June 2007, and was discharged from all active medical care by January 15, 2008.

¶4     In October 2008, the pain in Murray's shoulder returned after a day of bow hunting. He returned to the doctor and was prescribed more diagnostic tests and physical therapy.

¶5     On October 15, 2009, Murray filed a complaint against Whitcraft seeking damages for medical costs, past, present and future pain and suffering, loss of enjoyment of life and activity, emotional distress, and other compensatory damages arising from the injury sustained in the accident. A jury trial was held August 24-26, 2011. Murray sought damages in the suggested amount of $250,000, including past medical expenses of approximately $35,000. At the conclusion of trial, the jury determined that the accident caused injury to Murray and awarded Murray a total of $27,000 in damages.

¶6     Murray, having presented evidence of past medical expenses totaling $35,030.19, filed a motion for a new trial on the issue of damages. He asserted that the jury's total damages award of $27,000 was supported by insufficient evidence and that, during

3

closing argument, defense counsel "argued matters that were outside of the record." The District Court did not act on Murray's motion and it was deemed denied by operation of law after sixty days. M. R. Civ. P. 59(f).

## STANDARD OF REVIEW

¶7     We review de novo a district court's denial of a motion for a new trial on the ground of insufficient evidence. *Styren Farms, Inc. v. Roos*, 2011 MT 299, ¶ 11, 363 Mont. 41, 265 P.3d 1230 (citations omitted). "Our function in reviewing the sufficiency of proof of actual damages is to determine whether there is substantial credible evidence in the record to support the jury's verdict. We must view the evidence in a light most favorable to . . . the prevailing party below, and where the record presents conflicting evidence, resolved by the jury, this Court is precluded from disturbing the verdict." *Lauman v. Lee*, 192 Mont. 84, 88-89, 626 P.2d 830, 833 (1981). *See also Styren Farms*, ¶ 11; *Ele v. Ehnes*, 2003 MT 131, ¶ 25, 316 Mont. 69, 68 P.3d 835. Substantial evidence is that which a reasonable mind may find adequate to support a conclusion; "it may be less than a preponderance of the evidence, but must be more than a 'mere scintilla.' " *Styren Farms*, ¶ 11.

¶8     When the basis of a motion for new trial is an irregularity in the proceedings, we review the denial of the motion for a manifest abuse of discretion. *Styren Farms*, ¶ 12.

## DISCUSSION

¶9     *Is Murray entitled to a new trial?*

¶10     Jury Instruction No. 15 required the jury to determine whether Whitcraft's admitted negligence caused Murray's injuries and then to calculate the amount of money

4

that would reasonably compensate Murray "for all of the loss *caused by Defendant . . . .*" (Emphasis added.) The instruction stated:

> Provided that the evidence shows that they exist and that the cause of which was the accident in question, the damages should include:
>
> 1. <u>Past and Future Health Care Expenses</u>: reasonable value of necessary care, treatment and services received and those reasonably probable to be required in the future.
>
> 2. <u>Past and Future Pain and Suffering</u>: reasonable compensation for any pain and suffering experienced and reasonably probable to be experienced in the future by Tyson Murray. . . .
>
> 3. <u>Past and Future Emotional Distress</u>: reasonable compensation for any mental and emotional suffering and distress experience[d] by Tyson Murray and reasonably probable to be experienced in the future. . . .
>
> 4. <u>Alteration of Established Course of Life</u>: If you find that Tyson Murray has been permanently injured or will continue to suffer in the future from his injuries, you should award reasonable compensation for the diminution and loss of enjoyment of life and for the diminution and loss of established course of life.

Murray argues that, upon determining that Whitcraft's negligence caused Murray's injury, the jury was required to award the full amount of uncontested damages he alleged, which spanned all four categories listed in the instruction. He contends that, "[t]he jury failed to award full damages encompassing the past medicals, and simply did not follow the law given in Jury Instruction No. 15." Whitcraft argues the jury was not obligated to award all four types of damages and points out that the verdict does not specify "the precise nature of the injury the jury found to be accident-related, nor how much it awarded for the various damage categories alleged."

5

¶11    The instruction directed the jury to calculate the amount of accident-caused injuries, "[p]rovided the evidence shows that they exist," falling into any of the four categories. It did not provide that damages must be awarded in each of the four categories but instead made clear that the jury should award damages only for those injuries shown to be caused by Whitcraft's admitted negligence. The jury also was instructed that Murray had the burden to prove by a preponderance of the evidence "the amount of money that will compensate him for his injuries and damages caused by Defendant Kyle Whitcraft."

¶12    Having reviewed the instructions, the jurors completed a verdict form that directed them to answer two questions—whether the accident was "the cause of injury to Tyson Murray" and, if so, "[w]hat is the total amount of money which will compensate the Plaintiff for his damages?" Thus, after checking the box "Yes" as to whether the accident caused injury to Murray, the jurors were asked only to provide a total damages figure, which they calculated at $27,000. The verdict form did not ask the jury to itemize damages across the four categories listed in Jury Instruction No. 15, nor did it inquire as to the extent to which Murray's injuries were caused by "the accident in question"— leaving this instead as a "yes" or "no" question. This general verdict form—to which Murray did not specifically object—does not permit us to ascertain the individual categories of damages from which the jury derived its total award.[1] *See Horn v. Bull*

---

[1] Murray did object to the inclusion of the first question in the verdict form because he believed that the admitted negligence answered the question of causation and that the jury need only determine the damages figure. The District Court decided to include the first question because

6

*River Country Store Props.*, 2012 MT 245, ¶ 25, 366 Mont. 491, ___ P.3d ___ ("[W]e certainly will not speculate when the verdict form does not explain the jury's thought process.") (quoting *Seltzer v. Morton*, 2007 MT 62, ¶ 97, 336 Mont. 225, 154 P.3d 561) (internal quotation marks omitted).

¶13 Murray's contention that the jury was obligated to award damages for all of his *alleged* accident-related injuries assumes that, by answering "Yes" to the first question, the jury found that Whitcraft's negligence was the only cause of those injuries—an assumption Whitcraft disputed at trial. Whitcraft presented evidence and cross-examined Murray's key witnesses to suggest that the collision had caused little, if any, impact to Murray's shoulder, and that Murray had re-injured the shoulder on a later occasion while bow hunting.

¶14 Whitcraft presented photographs to show that the damage occurred primarily to the front driver's side of the vehicle, where Whitcraft had been sitting, yet the force of the collision did not cause Whitcraft any injury or cause the air bags to deploy. Additionally, Whitcraft's cross-examination of Murray and Gregory Tierney, MD, the orthopedic surgeon who examined and operated on Murray's shoulder, elicited testimony that Murray gave inconsistent reports about how and whether he remembered being injured during the accident. Based on his review of Murray's medical records, Dr. Tierney acknowledged that when Murray visited the emergency room on October 17, 2006, the day of his accident, he was uncertain whether he hit his neck and shoulders during the

"It is admitted liability as to the accident. It is not admitted liability as to the injury." Murray does not challenge this ruling on appeal.

7

collision whereas, in a subsequent doctor's visit, Murray stated that the injury resulted from his shoulder slamming into the car door. Murray's chiropractor, Mark Stoebe, testified that during Murray's appointment in June 2007, Murray recounted that the accident caused him to hit his head and right side hard enough that he saw stars. Cross-examination of Murray further developed that he provided different accounts of his experience of injury during the accident:

> MR. HAFFEMAN: After you went to the emergency room you agree that you told the emergency room physician that you didn't remember if you hit your right side of your neck or your right shoulder, correct?
>
> MR. MURRAY: Correct.
>
> MR. HAFFEMAN: And, you testified today that your neck felt like it was on fire that day, correct?
>
> MR. MURRAY: Correct.
>
> MR. HAFFEMAN: You know that is not documented in the emergency room note, don't you?
>
> MR. MURRAY: I told them my neck and shoulder hurt and they checked me out.
>
> MR. HAFFEMAN: You are aware that the emergency room report documents that you described yourself as being mildly tender and that is the extent of your symptoms.
>
> MR. MURRAY: I mean, if it is in the report then that must be what I said.

¶15 According to Dr. Tierney, Murray's medical records indicated that the emergency room x-rays showed no acute injury and Murray was diagnosed with a "probable cervical strain or sprain and probable strain or contusion of the right shoulder." A radiologist interpreted a shoulder MRI taken soon after the accident as indicating labral

8

degeneration, which Dr. Tierney agreed generally indicates an "aging" or "wearing away" process. Whitcraft elicited additional testimony to suggest that while Murray complained of pain when engaging in "moderate to heavy weight lifting," he was able to perform his daily activities without increasing his pain. Dr. Stoebe, who provided chiropractic treatment to Murray beginning in April 2007, testified that, during his first visit, Murray ranked his shoulder pain as a four on a scale of one to ten. By his fourth visit, Murray described his shoulder pain as mild and tolerable. During late May through June, 2007, the shoulder problem had resolved to the point where Murray rated his pain at approximately one on a scale of one to ten and required as medication only a non-prescription pain reliever, as needed. An arthrogram and shoulder MRI taken in June 2007 were "normal."

¶16    Murray thereafter elected to have arthroscopic surgery performed by Dr. Tierney in a further attempt to discover any abnormalities and resolve them. Dr. Tierney's operative note stated that Murray's shoulder was normal, with the exception of some "mild injection"—defined as dilated and inflamed blood vessels—and "mild fraying" under the surface of the rotator cuff. Dr. Tierney agreed that this "impingement" is a common condition that can be caused by aging and overuse, which would be consistent with a baseball career. Nonetheless, he testified that "[a]ll of [Murray's] problems seemed to be post-injury. So, in my mind, on a more probable than not basis, it was related to the injury[.]" Dr. Tierney testified that Murray recovered from his surgery, completed physical therapy, and was released from active treatment in January 2008. Murray did not seek additional treatment until nine months later, after he experienced

9

pain while bow hunting. On redirect examination, Murray sought to establish that the renewed pain had been caused by the vehicular accident, rather than the bow hunting incident, but Dr. Tierney testified that re-injury was a possibility:

> MR. HOINES: And, is it your belief that the injury he suffered by carrying the bow was related to the injuries he received in the car accident?
>
> DR. TIERNEY: Again, as we mentioned earlier, shoulder problems once initiated can flare intermittently depending upon the activity level that one is involved with. So, it is very possible that it was. Can you have another injury? Sure. . . .

¶17 Whitcraft also elicited testimony from Murray and his father that Murray had been able to carry on with his normal recreational activities—including flag football, big game hunting, fishing, and league bowling. Murray stated that he currently performed all of the daily life and recreational activities that he did prior to the accident, with the exception of baseball.

¶18 Based on the conflicting evidence, Whitcraft suggested in his closing argument that the jury award a lower figure than the sum of medical expenses Murray had provided:

> In this case you have $35,000.00 in medical expenses. And we know that $35,000.00 includes not only everything up to and following that first surgery, or that only surgery, but we know that there was a nine month gap in treatment. . . . If you believe that everything up to this point in time, that is, everything up to the first surgery was related to the accident and there is plenty of evidence that would suggest that there is some reason to question that. . . . [Y]ou are going to have the photographs of the vehicle in the jury room and you are going to see that the side of the vehicle on which Tyson Murray was sitting was undamaged and that the damage was to the driver's side of the vehicle and to the front of the vehicle. . . . [I]f you accept the premise that there was injury suffered in the accident and that all the injuries up to the point in the first surgery and following, it is not $35,000.00, it is roughly $26,000.00 and that the difference between these

10

two is the re-injury in the bow hunting incident. . . . So, you have to say, of that $35,000.00, what actually is related to the accident and what was not? And, I would respectfully suggest that perhaps there is a lower figure than the re-injury figure.

¶19 Murray argues on appeal that Whitcraft's estimated damages figure of $26,000 was improper because it was not supported by evidence at trial. Murray did not object during this portion of defense counsel's closing argument, but argued in rebuttal that counsel "hasn't been truthful" in his synopsis of Murray's medical condition and that Murray's injuries would continue to affect him and require medical treatment as he aged.[2]

¶20 The jury was not obligated to award all of Murray's proposed damages after it found that the accident caused injury to Murray. While Murray argues that Whitcraft did not introduce evidence to support his suggested lower damages award, it was Murray who had the burden of proving by a preponderance of the evidence that he was entitled to all of his proposed damages. Whitcraft points out that "Murray did not call any medical expert to testify as to the amount of his medical expenses, and the extent to which those expenses could be considered accident-related. Instead, he simply admitted into evidence a summary of *all* of his expenses, which totaled $35,040.19." Plaintiff's Exhibit 15, entitled "Plaintiff Tyson Murray's Medical Expenses," simply listed eleven medical care providers, including the following: "Benefis Healthcare," "Radiology Montana,"

---

[2] Murray's counsel made two objections during the defense closing argument, both of which were overruled. The first objection was to defense counsel's suggestion that Murray had argued for an unreasonable damage figure to get the jury to award higher damages. The second was to defense counsel's characterization of Dr. Tierney's testimony. The trial court properly noted that the jury was to decide what the evidence showed. To the extent Murray now claims error in defense counsel's estimate of Murray's accident-related medical expenses, his lack of contemporaneous objection failed to preserve his right to claim error on appeal. *Horn*, ¶ 41. The District Court did not manifestly abuse its discretion in denying Murray's motion for new trial on the basis of the claims he preserved through the two objections he did raise.

11

"Orthopedics [sic] Associates of Fargo," "Community MRI," "Central Montana Medical Clinic," "Empi," and others, as well as a general category of "Prescriptions." Each entry was accompanied by a total figure for services received—the highest summing $ 23,251.48—with no listed dates, individualized doctor visits, or treatment descriptions. The parties agreed that Exhibit 15 reflected the total amount of medical bills Murray claimed, but left the jurors to determine which expenses were caused by the vehicle accident and which, if any, were attributable to the alleged re-injury.

¶21 The record does not reflect that the underlying medical records were admitted into evidence. The jury was instructed to consider the credibility and qualifications of the expert witnesses, as well as the reasons they gave for their opinions. Jury Instruction No. 9 stated, "You are not bound by such opinion. Give it the weight, if any, to which you deem it entitled." Though Dr. Tierney believed it more probable than not that the accident caused Murray's injuries, he based his opinion on the absence of symptoms prior to the accident, rather than on a particular medical finding, and he acknowledged both that the impingement syndrome Murray experienced can be caused by overuse and that Murray's symptoms had resolved prior to the hunting incident. In evaluating causation and calculating damages, the jurors were free to gauge witness credibility and to weigh the evidence that was presented to determine Murray's claimed medical expenses allegedly caused by the accident. We conclude that Whitcraft raised substantial conflicts in the evidence regarding the cause of Murray's injuries "that a reasonable mind might accept as adequate to support a conclusion" that he was not entitled to all of the claimed damages. *Styren Farms*, ¶ 11.

12

¶22 Because we cannot determine the degree to which the jury found Whitcraft's negligence caused Murray's injuries and the precise nature of the damages the jury awarded to Murray, the three cases upon which Murray relies—*Hoffman v. Austin*, 2006 MT 289, 334 Mont. 357, 147 P.3d 177, *Thompson v. City of Bozeman*, 284 Mont. 440, 945 P.2d 48 (1997), and *Renville v. Taylor*, 2000 MT 217, 301 Mont. 99, 7 P.3d 400—are not controlling. In all three cases, the jury found that the defendant's negligence caused the plaintiff's injury and a new trial was granted due to the jury's failure to award uncontested damages in specific categories. In each of those cases, unlike the present case, the jury's verdict reflected the damages the jury had failed to award—pain and suffering, mental and emotional distress and loss of established course of life, among others, *Hoffman*, ¶ 11 (overruled on other grounds) and *Thompson*, 284 Mont. at 446-47, 945 P.2d at 52; and pain and suffering, future medical expenses, loss of earning capacity and loss of established course of life, *Renville*, ¶ 13.

¶23 In *Hoffman* and *Thompson*, the juries completed special verdict forms that made clear they awarded no damages for pain and suffering. *Hoffman*, ¶ 11; *Thompson*, 284 Mont. at 442, 945 P.2d at 49. While Murray points out that the jury in *Renville* appears to have been presented with a general verdict form similar to the one used in this case, the damages in that case had not been disputed by evidence supporting a possible subsequent injury and the defense did not controvert evidence that established the plaintiff's significant pain following the negligently caused accident. The defendant in *Renville* elicited testimony, rather, that the plaintiff's symptoms of pain and suffering had been exaggerated due to her pre-existing psychological issues, but the psychiatrist's testimony

13

"did not controvert the evidence that she had pain and suffering as a result of the accident." *Renville*, ¶ 25.

¶24 We concluded in *Renville* that the jury's award, limited only to past medical expenses, was contrary to the uncontradicted credible evidence. In this case, in contrast, the jury considered conflicting evidence as to whether Murray suffered any significant injury from the car crash—Murray's x-ray at the emergency room showed no acute injury and he reported none at the time, he was unable to recollect suffering injury or significant pain immediately following the accident, and he carried on with all physical recreational activities, except baseball. Based on Whitcraft's cross-examination of Murray's doctor, the jury could have found that Murray experienced little pain, except when playing baseball, until the bow hunting incident. By contrast, the plaintiff in *Renville* experienced everyday pain so severe that she visited the emergency room on more than one occasion, and was treated with nerve block injections due to her locked neck. *Renville*, ¶¶ 18-22.

¶25 Finally and critically, unlike *Renville*, we are unable to ascertain that the jury awarded zero damages for pain and suffering. Whitcraft suggested in his closing argument:

> All I would suggest is that you come up with a figure which illustrates to Tyson the fact that you take seriously the fact that it was probably painful having that shoulder surgery and having a sore shoulder and it was, for lack of a better word, it was a bummer that he wasn't able to go on and continue to play baseball like he wanted to do. . . . This is, you know, pain and suffering, loss of established course of life, something in the twenty thousand dollar ($20,000.00) to thirty thousand dollar ($30,000.00) range is telling Tyson that we acknowledge the fact that this was a bad and unfortunate thing that happened to you, but your life is not over.

14

¶26 If it agreed with Whitcraft's theory, the jury could have been persuaded that its $27,000 verdict would compensate Murray for the damages caused by the accident. The jury's verdict leaves room for interpretation about what it reasonably believed constituted the medical expenses from the collision, the amount of pain and suffering, the potential loss of Murray's $500 scholarship, and other losses. When sufficiency of the evidence is challenged, it is our job as an appellate court to probe the record for evidence to support the fact-finder's determination. "The function of this Court is not to agree or disagree with the jury's verdict," *Renville*, ¶ 14, and "consequently, if conflicting evidence exists, we do not retry the case because the jury chose to believe one party over the other." *Ele*, ¶ 25 (citations omitted). We conclude that substantial evidence supported the jury's conclusion that Murray was not entitled to the full amount of damages he requested and thus, the District Court did not abuse its discretion by denying Murray's motion for a new trial.

¶27 The judgment of the District Court is affirmed.


/S/ BETH BAKER


We concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice Patricia O. Cotter dissents.

¶28    I dissent.  I would reverse and remand for a new trial because the evidence does not support the verdict rendered by the jury.

¶29    The District Court determined prior to trial that Whitcraft was legally responsible for the accident.  The jury found that the accident was the cause of injury to Murray.  As the Court noted at ¶ 10, the court instructed the jury that—provided that the evidence shows that they exist and that the cause of such damages was the accident in question—the damages *should include* past and future health care expenses, past and future pain and suffering, past and future emotional distress, and alteration of established course of life. (Emphasis added.)

¶30    The Court's summary of the evidence focuses on alleged discrepancies in the record—what symptoms Murray might have initially reported, how various health care providers measured his degree of pain, etc.  These "discrepancies" with respect to matters of little consequence are the most the Court can muster in support of the verdict because the overall record completely belies the notion that Murray was not injured, that he did not have pain, and that he did not experience devastation and distress at losing his baseball career to his injury.  Although defense counsel argued mightily in closing for the return of a low verdict, the argument was premised on innuendo and little else—it was not premised on the evidence.

¶31    As an initial matter, there was no evidence that Murray had any pre-existing injuries to his neck and shoulder, much less degenerative changes occasioned by aging

16

and overuse. He was a 19-year-old young man. Murray and his parents testified that he had no prior injury, as did his baseball coach who watched him perform on the baseball field day in and day out before the accident. His doctors likewise denied any pre-existing injury. Whitcraft did not impeach this evidence.

¶32 Second, the Court suggests that the collision could have caused "little, if any, impact to Murray's shoulder." Opinion, ¶ 13. There is no evidence to support this conclusion. In fact, Kyle Rector, the passenger who sat directly in front of Murray at the time of the accident on the same side of the vehicle, testified without contradiction that he suffered a partially torn labrum and rotator cuff as a result of the collision.

¶33 Third, there was copious and *uncontroverted* evidence that Murray experienced pain from the date of the accident forward and still does with activity today. He was referred from physician to chiropractor to physical therapist and back to physician in search of pain relief. The four health care providers who testified referenced varying levels of pain, including acute pain after surgery, pain during therapy and rehabilitation, and flaring pain upon attempting to throw a baseball. While the levels of pain surely fluctuated, which is to be expected, all health care providers testified that Murray experienced pain over a protracted period of time. Murray attended over 150 medical appointments and therapy sessions of various sorts, all in an effort to stop the pain and put him back on the baseball diamond. All health care providers attributed his pain and limitations to his accident injury; all testified to his compliance as a patient; and none testified to doubts about his veracity. Whitcraft did not impeach these reports of pain through cross-examination.

¶34    On a more personal level, Murray and his parents testified to his pain and suffering, his limitations, his emotional distress and the alteration of his established course of life.  His mother cried with her son over his loss of his college baseball career.  She said the accident was "devastating" to Tyson, and that he was depressed and anxious.  His father said that while his son was not a complainer, he couldn't move his shoulder for about a week after the surgery and he was laid up from his work at a local store for about a month.  He said his son was depressed.  Whitcraft did not impeach any of this personal testimony through cross-examination.

¶35    Fourth, the Court provides excerpts of Dr. Tierney's testimony in an effort to support the verdict.  The fact is Dr. Tierney did not waiver in his assessment that the accident was responsible for all of Murray's injuries.  While Dr. Tierney admitted in response to defense counsel's question that an impingement syndrome condition such as Murray experienced *can be* caused by aging and overuse, he did not attribute Murray's injury to such problems:

> MR. HAFFEMAN:  And, other than the medical history that was provided to you by Mr. Murray and is reflected in the medical records, is there any way for you to tell whether the impingement syndrome that he had was caused by overuse versus a specific incident trauma?
>
> DR. TIERNEY:  All I can know is the temporal relationship of having no prior history, no prior treatment, had an injury, had treatment.  So, based on the temporal relationship on a more probably than not basis, it is related to the accident.

In addition, Dr. Tierney testified elsewhere in response to a question of whether it is his opinion that Tyson's injuries resulted from the motor vehicle accident:  "All of his problems seemed to

18

be post-injury. So, in my mind, on a more probable than not basis, it was related to the injury, yes."

¶36 Nor was Dr. Tierney's testimony about the bow incident as equivocal as the Court tries to suggest in its recap of testimony at ¶ 16 of the Opinion. When asked on re-direct whether he believed that the bow-hunting injury was related to the car accident, Dr. Tierney's complete answer was as follows:

> DR. TIERNEY: Again, as we mentioned earlier, shoulder problems once initiated can flare intermittently depending upon the activity level that one is involved with. So, it is very possible that it was. Can you have another injury? Sure. *But, it is not infrequent that people represent with problems with that joint.* [Emphasis added for testimony omitted from the Court's Opinion.]

¶37 Fifth, Dr. Tierney testified that the course of treatment Murray pursued was appropriate and necessary. The list of medical expenses that came into evidence without objection summarized the cost of those appropriate treatments and expenses. The total of the bills was approximately $35,000. The defendant did not cross-examine Murray, Dr. Tierney, or *any* of the other health care providers on the reasonableness or necessity of these expenses, nor did he present any evidence calling the charges into question. Rather, as the Court notes at ¶ 18 of the Opinion, counsel simply "suggested in his closing argument that the jury award a lower figure" than the sum requested.

¶38 The jury was instructed that in addition to medical expenses, it should award damages for pain and suffering, emotional distress and alteration of the established course of life. The testimony regarding Murray's pain, suffering, emotional distress and loss of established course of life was *uncontradicted.* The evidence of the reasonableness and necessity of at least $26,000 of the past medical expenses was *uncontradicted.*

19

Whitcraft's counsel suggested to the jury that some of the medical expenses were related to a separate bow-hunting injury. However, the medical testimony establishing that it was more probable than not that the bow-hunting problems were related to the accident was *uncontradicted.* In short, the evidence establishing that Murray suffered the damages for which the District Court ordered compensation was overwhelming and virtually unimpeached.

¶39 The Court makes much of the fact that because the verdict form did not ask the jury to itemize the categories of damage, it is not possible to determine the precise nature of the damages awarded to Murray. This is a valid point. But, under the record before us, precision of calculation is not a necessary predicate to a new trial. It is clear the jury did not award both the uncontested medical expenses *and* damages for Murray's pain, suffering, emotional distress and loss of established course of life. Because competent evidence of these elements of damage was presented and not refuted, the jury was obligated to make an award in this regard.

¶40 The Court tries but fails under the facts here to distinguish *Renville* from this matter. As here, the jury in *Renville* was presented with a general verdict form. As here, the jury in *Renville* awarded an amount equal to medical expenses but ignored the evidence of pain and suffering and loss of ability to pursue her established course of life. As the Court notes, Renville experienced everyday pain, had to visit the emergency room on more than one occasion, and had nerve block injections. Opinion, ¶ 24. By comparison, Murray too received injections, and also engaged in painful therapy and even underwent surgery in an attempt to relieve his pain. If anything, Murray's

20

post-accident course was more rigorous and protracted than Renville's. We concluded in *Renville* that the jury's damage award was not supported by substantial evidence and reversed the district court for failing to grant a new trial. The same result is compelled here.

¶41 I dissent from our willingness to countenance a verdict that is truly unsupported in the record. I would reverse and remand for a new trial.


/S/ PATRICIA COTTER


Justices James C. Nelson and Michael E Wheat join the dissent of Justice Patricia O. Cotter.


/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT