FILED

09/16/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0517

DA 24-0517

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 210

SHERRI FROST,

       Plaintiff, Appellee,
       and Cross Appellant,

   v.

KEVIN R. FROST,

       Defendant, Appellant,
       and Cross Appellee,

   and

FROST RANCHING CORPORATION,

       Defendant and Cross Appellee.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                  In and For the County of Ravalli, Cause No. DV-18-41
                  Honorable Jason Marks, Presiding Judge

COUNSEL OF RECORD:

       For Appellant Kevin R. Frost:

              Murry Warhank, Erin M. Lyndes, Jackson, Murdo & Grant, P.C.,
              Helena, Montana

       For Appellee Sherri Frost:

              Nicole L. Siefert, Matt Rossmiller, Siefert & Wagner, PLLC, Missoula,
              Montana

       For Cross-Appellee Frost Ranching Corporation:

              Curt Drake, Patricia Klanke, Drake Law Firm, P.C., Helena, Montana

Submitted on Briefs:  July 23, 2025

Decided:  September 16, 2025

Filed:

_____
Clerk

2

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Kevin R. Frost (Kevin) appeals from the August 2, 2024 Order of the Twenty-First Judicial District Court, Ravalli County, granting Sherri Frost's (Sherri) motion for a new trial. The District Court held that the jury's award of $20,000 in damages was not supported by substantial evidence because Sherri had established at least $20,000 in past medical expenses alone, as well as proved that she was entitled to some compensation related to at least one other category of damages. Sherri cross-appeals the District Court's order granting Frost Ranching Corporation's (the Ranch) Rule 50 motion for judgment as a matter of law. Sherri maintains the court erred in concluding the Ranch could not ratify Kevin's conduct absent a "successful benefit" to the Ranch.

¶2 Kevin presents the following issue for review:

1. *Whether the District Court correctly held there was insufficient evidence to support the jury's award of damages.*

Sherri raises the following issue on cross-appeal:

2. *Whether the District Court correctly held that the Ranch could not ratify Kevin's conduct absent a "successful benefit" to the Ranch.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The origins of this matter date back to February 2016, when Kevin kidnapped his estranged wife, Sherri. At the time, the two parties were engaged in a contentious divorce, and they no longer resided together. On the morning of February 9, 2016, Kevin drove to the house of Sherri's new boyfriend, Brian Moore. He placed a garbage can in the driveway so Sherri would have to stop to get out to move it. When she did, Kevin seized her and forced his way into her vehicle. Kevin then took her to where he had parked a GMC Yukon

3

that he purchased two weeks previously. Kevin never told anyone in his family that he had purchased the Yukon; the Yukon was not registered; and Kevin kept it parked in downtown Hamilton far from his own property. Once the Yukon was retrieved, Kevin took Sherri to a barn owned by a longtime associate of the Frost family, Dean Allen. Allen leased the land from the Frost Ranch and paid Kevin to take care of his property any time he was out of state. After holding Sherri for roughly six hours, during which Kevin forced her to become severely intoxicated, he delivered her to the emergency room and turned himself in to the Ravalli County Sheriff's Office. Sherri's Blood Alcohol Content was measured at 0.140. Kevin plead guilty to partner family member assault and kidnapping, and served a prison sentence from June 9, 2017, to September 16, 2020. Additionally, Kevin is subject to a restraining order that prevents him from contacting Sherri.

¶4 On February 2, 2018, Sherri filed her initial complaint seeking damages and demanding a jury trial. In addition to Kevin, the complaint named as defendants Margot and Dean Allen, who own the property where Kevin took Sherri; the Frost Ranching Corporation, which owns and operates Kevin's family ranch; the Frost Limited Partnership, which owns the land constituting the Ranch; and multiple insurance companies. In August 2020, she filed her first amended complaint, which did not include claims against the insurance companies named in the original complaint. The amended complaint alleged that Kevin had acted in the interests of or as an agent for Frost Limited Partnership and/or the Ranch when Kevin kidnapped her. Specifically, Sherri argued that Kevin's actions were motivated, at least in part, by the Ranch's goal of preventing Sherri from receiving

4

any part of the Ranch in the divorce. Margot and Dean Allen, as well as Frost Limited Partnership and the Ranch, moved for summary judgment on the basis that Kevin's criminal actions were unrelated to them. The District Court granted the Allens' motion for summary judgment, and the claims against them were dismissed with prejudice. In an October 2022 order, the District Court granted Frost Limited Partnership summary judgment on all counts. Regarding the Ranch's motion for summary judgment, the District Court denied it in part, concluding that "reasonable minds could differ as to whether Kevin was technically an employee of the [Ranch]," and therefore did not dismiss the count of vicarious liability.

¶5 Following her husband's death in 2015, Marilynn Frost became president, sole shareholder, and director of the Ranch. The Ranch owns the cattle and ranching equipment, but the land, however, is owned by the Frost Limited Partnership. The Ranch possesses a 1% general partnership interest, while the limited partnership percentages are: Marilynn Frost 19%, Kevin Frost 40%, and Kevin's brother, Randy Frost, 40%. Following Kevin's arrest for kidnapping, the Ranch paid $50,000 for his bail and provided an additional $25,000 for his criminal defense attorney. Moreover, the decision to fund Kevin's legal fees with Ranch money was discussed and agreed upon by Marilynn and Randy. Marilynn stated at trial that she used Ranch funds because she "didn't have that kind of money in [her] personal checking account at that time." The Ranch, however, did have the money because of a cattle sale held a few months previously. As the sole shareholder of the Ranch, Marilynn is entitled to make distributions from its funds. Kevin and Marilynn have since

executed a promissory note where Kevin has agreed to pay back the funds she had loaned on his behalf.

¶6 Kevin had an active role with the Ranch prior to the events of the kidnapping. Since at least 1996, Kevin has held himself out as an employee of the Ranch. Since their father's illness, Kevin and Randy have overseen the day-to-day activities at the Ranch, which include feeding the cattle and farming the land. Kevin has also helped in facilitating business transactions for the Ranch. During the time he was released on bail prior to his conviction and sentencing, and again after serving his sentence, Kevin worked at the Ranch full-time and received a W-2, with a percentage of his wages going towards fulfilling his obligations under the promissory note with Marilynn.

¶7 Kevin's interest in the Frost Limited Partnership was a topic of discussion in Kevin and Sherri's divorce. Their respective counsel exchanged correspondence regarding the status of the Frost Limited Partnership as marital property as early as December 2015. On January 29, 2016, Sherri's attorney began drafting a motion to join additional parties, and on February 8, 2016, Sherri's attorney contacted Kevin's attorney to discuss "hiring a counselor for parenting and adding the limited partnership as a party to the case." At trial, Kevin recalled conversing with his attorney that night about the parenting plan for he and Sherri's son. Kevin further testified that he discussed the matter with their son himself, and that the conversation was emotional. The following day, Kevin kidnapped Sherri. During captivity in Dean Allen's barn, Sherri and Kevin discussed their kids, and Kevin expressed his concern over Sherri trying to take the family ranch in the divorce. At no

6

point during the events of the kidnapping did Kevin use vehicles or equipment owned by the Ranch, nor did he enter any property owned by Frost Limited Partnership.

¶8 A jury trial was held in Ravalli County from March 11 through 20, 2024, on Sherri's complaint. Sherri testified that she was convinced she was going to die, as her attempts to exit the Yukon and draw attention to the ongoing situation were all stifled by Kevin. Kevin had also shut her phone off. Officers discovered evidence of a struggle where the kidnapping occurred in Brian's driveway. Kevin was named the main suspect, and law enforcement was concerned Sherri's abduction could turn into a homicide. Within Kevin's Yukon, law enforcement found a stun gun that was used to coerce Sherri (though it was never fired upon her), as well as a knife, clothes, and a couple bottles of liquor.

¶9 Over the course of the trial, Sherri presented evidence of pain and suffering, emotional distress, future care, lost earning capacity, loss due to value of services, and loss of established course of life. As part of her medical expenses, Sherri argued that the kidnapping was the cause of a rotator cuff tear and subsequent surgery. However, the District Court granted Kevin's motion for judgment as a matter of law on this matter and excluded the cost of Sherri's surgery from her damages because her surgeon did not testify at trial. With the cost of the surgery removed, Sherri proposed that the amount of past medical care stemming from the kidnapping was $25,392.15. Additionally, she also provided expert testimony that supported her claim that she suffered from PTSD as a result of the kidnapping. Sherri provided recommendations to the jury for other categories of damages, such as $1.4 million for past pain and suffering, $1.2 million for loss of

7

established course of life, and $682,000.97 for past lost wages. In his closing argument, however, Kevin disputed Sherri's proposed totals. For past medical expenses, Kevin argued that the number should be "closer to $20,000," and that the more appropriate range for all damages should be $80,000 to $100,000.

¶10 The jury issued its verdict through a Special Verdict form. It found that Kevin was liable to Sherri for negligence, assault, battery, and false imprisonment, but did not find him liable for intentional infliction of emotional distress. Moreover, the Special Verdict form expressly asked the jury to decide the total amount of damages sustained by Sherri, providing several categories of damages for the jury to consider, such as medical care and pain and suffering. Below the list of damage categories was a single line for the jury to write its total amount of damages. The jury returned a verdict of $20,000 in total damages to be awarded to Sherri.

¶11 As for the Ranch, it made a Rule 50 motion for judgment as a matter of law on all theories of vicarious liability. The Ranch specifically argued that, as a matter of law, there could be no ratification by the Ranch of Kevin's acts, citing to the fact that they had not accepted any benefit stemming from Sherri's kidnapping. The District Court granted the Ranch's motion regarding ratification on the grounds that there had been no evidence of "any benefit of the underlying act here." The remainder of the motion, which concerned whether Kevin's actions were incidental to an authorized act, was taken under advisement by the court. Sherri, conversely, made her own motion for judgement as a matter of law,

8

arguing Kevin was an agent of the Ranch. The District Court denied Sherri's motion and submitted that question to the jury.

¶12     On April 11, 2024, Sherri filed a motion with the District Court requesting a new trial based on the jury's inadequate damage award. She argued that the jury's verdict was not supported by substantial evidence and therefore must be set aside. Specifically, she asserted that the jury failed to account for the total amount of damages, despite those damages being established by uncontradicted, credible, non-opinion evidence. However, in his Response filed April 29, 2024, Kevin maintained that there was no indication the jury failed to consider all the evidence when it awarded only $20,000. Kevin argued that the jury could have properly concluded Sherri did not suffer from PTSD, that she exaggerated her symptoms, that her shoulder injury was not significant, and that Sherri's opinion testimony—including from experts—was not credible. Therefore, Kevin argued $20,000 was a reasonable amount to account for Sherri's past medical expenses plus some amount for other categories of damages. The District Court granted Sherri's request for a new trial reasoning there was not substantial evidence to support the jury's award of $20,000 because she had established at least $20,000 in past medical expenses, as well as entitlement to some compensation to at least one other category of damages, pain and suffering. Thus, this matter was set for a new trial on the issue of damages because, as the District Court concluded, the jury disregarded uncontradicted, credible, non-opinion evidence.

**STANDARD OF REVIEW**

¶13 The standard of review for a district court's ruling on a motion for a new trial depends on the basis of the motion. *State v. Brennan*, 2025 MT 46, ¶ 13, 421 Mont. 31, 565 P.3d 302. When a district court rules on a motion for a new trial based on insufficiency of the evidence, our standard of review is de novo because the determination of whether the evidence is sufficient is "ultimately an analysis and application of law to the facts, not a matter of discretion." *Brennan*, ¶ 13. Substantial evidence is defined as evidence that a reasonable mind could accept as adequate to support a conclusion; it must be more than a "mere scintilla" but can be less than a preponderance of the evidence. *Fish v. Harris*, 2008 MT 302, ¶ 8, 345 Mont. 527, 192 P.3d 238. We view the evidence in a light most favorable to the prevailing party when determining whether substantial evidence supports the verdict. *Neal v. Nelson*, 2008 MT 426, ¶ 15, 347 Mont. 431, 198 P.3d 819. Here, the evidence shall be viewed in the light most favorable to Kevin.

¶14 We review for an order granting a motion for judgment as a matter of law de novo. *Warrington v. Great Falls Clinic, LLP*, 2019 MT 111, ¶ 9, 395 Mont. 432, 443 P.3d 369. When there is a complete absence of any evidence that would justify submitting an issue to a jury, judgment as a matter of law is appropriate, "and all such evidence and any legitimate inferences that might be drawn from the evidence must be considered in the light most favorable to the party opposing the motion." *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 13, 336 Mont. 105, 152 P.3d 727. The courts of Montana should exercise significant restraint in interfering with the jury's constitutionally mandated role. *Johnson*,

¶ 13.  If reasonable persons could differ regarding conclusions that could be drawn from the evidence, then judgment as a matter of law is not proper.  *Johnson*, ¶ 13.

## DISCUSSION

¶15  *1. Whether the District Court correctly held there was insufficient evidence to support the jury's award of damages.*

¶16  Kevin argues that the District Court erred by speculating about the jury's intent. Moreover, he adds that the jury could have—and did—find that Sherri was not owed the amount in medical expenses that either party suggested and awarded a small amount of pain and suffering damages.

¶17  New trials are governed by Rule 59 of the Montana Rules of Civil Procedure, which provides in relevant part:

> (1) The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:
> (A) After a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in Montana state court[.]

M. R. Civ. P. 59(a)(1)(A).  Additionally, Montana law also explains grounds for a new trial:

> The former verdict or other decision may be vacated and a new trial granted on the application of the party aggrieved for any of the following causes materially affecting the substantial rights of the party: . . . insufficiency of the evidence to justify the verdict or other decision or that it is against the law[.]

Section 25-11-102(6), MCA.

¶18  The function of this Court is to determine whether there was substantial evidence to support the verdict.  *Renville v. Taylor*, 2000 MT 217, ¶ 14, 301 Mont. 99, 7 P.3d 400.

"Substantial evidence is that which a reasonable mind may find adequate to support a conclusion." *Murray v. Whitcraft*, 2012 MT 298, ¶ 7, 367 Mont. 364, 291 P.3d 587. "If conflicting evidence exists, we do not retry a case because the jury chose to believe one party over another." *Renville*, ¶ 14. This Court will not substitute its judgment for that of the jury. *Renville*, ¶ 14. However, a jury may not disregard uncontradicted, credible, non-opinion evidence. *Renville*, ¶ 14.

¶19 Kevin argues that *Murray* is most analogous to this matter because, as in *Murray*, the jury here weighed evidence regarding the actual severity of Sherri's injuries. Sherri however, posits, and the District Cour likewise concluded, that *Renville* is most analogous to this matter because it is the extent of Sherri's damages that are at issue, not whether she had been injured.

¶20 In *Murray*, a plaintiff passenger filed suit against a defendant driver seeking damages allegedly caused by the driver's negligence. *Murray*, ¶ 5. After the jury returned a verdict in favor of the passenger and awarded him $27,000, the passenger filed a motion for new trial on the issue of damages. *Murray*, ¶ 6. The passenger claimed that the district court abused its discretion in denying his motion for a new trial under M. R. Civ. P. 59. *Murray*, ¶ 6. However, we held that the jury was not obligated to award all the passenger's proposed damages after it found that the accident caused injury to the passenger. *Murray*, ¶ 20. Even though the driver did not provide evidence to support an award of lower damages, the burden was on the passenger to prove that he was entitled to all his proposed damages. *Murray*, ¶ 20. Rather than calling experts to testify as to the amount of his

medical expenses, and the extent to which those expenses could have been accident-related, the passenger simply admitted into evidence a summary of all his expenses. *Murray*, ¶ 20. Since the driver was able to raise substantial conflicts in the evidence regarding the cause of the passenger's injuries that a reasonable mind could have accepted as adequate to support a conclusion that the passenger was not entitled to all the damages claimed, we affirmed the district court's denial of a new trial. *Murray*, ¶ 26.

¶21    *Renville* was also an appeal of a district court's denial of a motion for a new trial following a jury award of damages that did not meet the appellant's medical expenses resulting from an automobile accident. *Renville*, ¶¶ 1, 6, 13. Arguing that the evidence warranted greater damages, appellant sought a new trial based on insufficiency of the evidence to justify the verdict. *Renville*, ¶ 16. We held that, while it was within the jury's province to weigh the evidence and determine credibility, the jury could not disregard uncontradicted, credible, non-opinion evidence. *Renville*, ¶ 26. The appellant did provide evidence at trial that they were entitled to some award of damages for pain and suffering, and we determined the jury's award was not supported by substantial evidence and should be set aside. *Renville*, ¶ 26.

¶22    In *Murray*, we noted two key differences from *Renville*. First,

> [t]he damages [in *Renville*] had not been disputed by evidence supporting a possible subsequent injury and the defense did not controvert evidence that established the plaintiff's significant pain following the negligently caused accident. The defendant in *Renville* elicited testimony, rather, that the plaintiff's symptoms of pain and suffering had been exaggerated due to her pre-existing psychological issues, but the psychiatrist's testimony 'did not controvert the evidence that she had pain and suffering as a result of the accident.'

13

*Murray*, ¶ 23 (citing *Renville*, ¶ 25). Additionally, we explained:

> the jury's award, limited only to past medical expenses, was contrary to the uncontradicted credible evidence. In [*Murray*], in contrast, the jury considered conflicting evidence as to whether [the plaintiff] suffered any significant injury from the car crash—[the plaintiff]'s x-ray at the emergency room showed no acute injury and he reported none at the time, he was unable to recollect suffering injury or significant pain immediately following the accident, and he carried on with all physical recreational activities, except baseball. Based on [the defendant]'s cross-examination of [the plaintiff]'s doctor, the jury could have found that [the plaintiff] experienced little pain, except when playing baseball, until the bow hunting incident. By contrast, the plaintiff in *Renville* experienced everyday pain so severe that she visited the emergency room on more than one occasion, and was treated with nerve block injections due to her locked neck.

*Murray*, ¶ 24 (citing *Renville*, ¶¶ 18-22). Second, the *Murray* court stated that "unlike *Renville*, we are unable to ascertain that the jury awarded zero damages for pain and suffering." *Murray*, ¶ 25. In their closing argument, the defendant in *Murray* stated:

> All I would suggest is that you come up with a figure which illustrates to [the plaintiff] the fact that you should take seriously the fact that it was probably painful having that shoulder surgery and having a sore shoulder and it was, for lack of a better word, it was a bummer that he wasn't able to go on and continue to play baseball like he wanted to do . . . . This is, you know, pain and suffering, loss of established course of life, something in the twenty thousand dollar to thirty thousand dollar range is telling [the plaintiff] that we acknowledge the fact that this was a bad and unfortunate thing that happened to you, but your life is not over.

*Murray*, ¶ 25. This led the *Murray* court to conclude that the jury's verdict left room for interpretation about what it reasonably believed constituted the medical expenses from the collision, the amount of pain and suffering, the potential loss of the plaintiff's baseball scholarship, and other losses. *Murray*, ¶ 26.

¶23    Here, the trial transcript reveals that Sherri, through her own testimony and the testimony of her witnesses, established that she experienced pain and suffering during the kidnapping. Sherri called Dr. Scotti, a licensed psychologist who worked with Sherri after the kidnapping, to testify. Through a series of seven different tests and a structured clinical interview, he concluded that Sherri did indeed meet all six criteria for PTSD because of the kidnapping, and that she required additional treatment. While Kevin presented evidence that Sherri did suffer from physical and mental conditions that predated the kidnapping, he did not contest that she experienced pain and suffering because of the kidnapping. This is an important distinction from *Murray*, where the court was presented with evidence that the plaintiff reported no pain or injuries directly after the underlying incident. *Murray*, ¶ 26. Here, Dr. McFarland, an expert witness called by Kevin, conceded that Sherri's fear of Kevin was reasonable, and that the jury should "add[] some money for pain and suffering, some money for the fear that [Sherri] no doubt had on that day[.]" We conclude this case is more analogous to *Renville*, as the focus of Kevin's evidence and arguments was to show Sherri may have exaggerated her symptoms of pain and suffering, rather than providing testimony that Sherri had no pain and suffering that arose from the kidnapping.

¶24    While there was no testimony to controvert Sherri suffered at least some pain and suffering, determining whether the jury awarded zero damages for pain and suffering is less than clear. As noted above, a jury may not disregard uncontradicted, credible, non-opinion evidence. "However, 'this does not mean that where there is direct testimony in the record, uncontradicted by other direct testimony, that the court or jury is bound

15

thereby or cannot render a decision contrary to such direct testimony.'" *Magart v. Schank*, 2000 MT 279, ¶ 15, 302 Mont. 151, 13 P.3d 390 (quoting *Holenstein v. Andrews*, 166 Mont. 60, 66, 530 P.2d 476, 479 (1975)). A jury is permitted to weigh uncontradicted testimony against adverse circumstantial evidence and other factors which may affect the credibility of the witness. *Magart*, ¶ 15; *Ele v. Ehnes*, 2003 MT 131, ¶ 32, 316 Mont. 69, 68 P.3d 835. Also of note is that Jury Instruction Number 13 in this matter provided that the jury was not required to give expert testimony "any more weight than of any other witness, or to give it any weight at all." However, the jury's decision still must be supported by substantial evidence.

¶25 In concluding that the jury awarded zero damages for pain and suffering, the District Court looked at Kevin's closing argument, which stated:

> You may recall at Hamilton [Physical Therapy] there was a ton of therapy that was given for physical therapy after her surgery to recuperate from that surgery, and that was something that was testified to. If you take out that, the physical therapy that occurred after the surgery, and also you discount half of the counseling sessions which were about her children, the number is not $25,000. The number is closer to [$]20,000. So we would agree that there is around $20,000 in medical expenses in this case.

Moreover, Kevin concluded his argument with the following:

> If we count the $20,000 in medical expenses and the amount that [Kevin] said that she needed to move, that Sherri needs to move, and then added some money for pain and suffering, some money for the fear that she no doubt had on that day, I think an appropriate range, Ladies and Gentlemen, for your verdict is between 80 and 100 thousand dollars.

Based on this closing argument, the District Court concluded that it was clear the jury submitted its $20,000 award based on Kevin's calculation of Sherri's past medical

expenses. Therefore, "the jury awarded Sherri nothing for other categories of damages, including pain and suffering, which was established by uncontroverted, credible, non-opinion evidence."

¶26 As stated above, a jury's award is supported by substantial evidence when a reasonable mind could accept the evidence as adequate to support a conclusion. *Murray*, ¶ 7. In *Murray*, we upheld a jury's verdict because it "le[ft] room for interpretation about what it reasonably believed constituted the medical expenses from the collision, the amount of pain and suffering . . . and other losses." *Murray*, ¶ 26. This case is distinguishable from *Murray* because the evidentiary posture here is materially different. In *Murray*, the jury was asked to resolve causation disputes as to both medical expenses and non-economic damages, and the general verdict fell within the range suggested by the defense. *Murray*, ¶ 24. Under those circumstances, this Court emphasized it could not speculate about how the jury allocated its award across categories. *Murray*, ¶¶ 25-28. By contrast, here Kevin himself urged the jury to award Sherri her past medical expenses—approximately $20,000—and then to "add some money for pain and suffering," suggesting an overall figure between $80,000 and $100,000. The jury's $20,000 verdict not only mirrored the medical-expense floor but undercut even the narrowed total of admissible medical costs ($25,392.15). Unlike *Murray*, where the verdict could reasonably be explained by the jury's acceptance of disputed causation evidence, the verdict here is inconsistent with uncontroverted, credible, non-opinion evidence of some pain and suffering arising from a violent felony. Accordingly, *Renville* governs.

17

¶27    Here, the District Court reasoned that there was no room for interpretation concerning what the jury reasonably believed constituted Sherri's past medical expenses, pain and suffering, and other losses because "it is clear the jury simply awarded Sherri $20,000 based on defense's suggested past medical expenses." While it may not be as "clear" the court held, we conclude on this record that the jury only awarded damages for past medical expenses despite uncontroverted, credible, non-opinion evidence of pain and suffering arising from the kidnapping. The District Court's reasoning aligns with our precedent. Unlike *Murray*, where the jury's final verdict fell within the amount suggested by defense counsel in final argument, the jury award here falls $60,000 below Kevin's minimum suggestion. Moreover, the $20,000 award is still less than the total medical expenses Sherri provided which related to the kidnapping. Accordingly, the jury's award is contrary to the uncontradicted, credible, non-opinion evidence, and therefore does not meet the substantial evidence threshold.

¶28    While it is challenging to ascertain whether the jury considered pain and suffering, or simply awarded $20,000 based on Kevin's closing argument, the record supports the District Court's conclusion that there is not substantial evidence to support the jury's verdict. It is undisputed that Sherri established that she is entitled to damages for both medical expenses and pain and suffering. Since the verdict appears to only reflect past medical expenses, we conclude the jury disregarded uncontradicted, credible, non-opinion evidence of pain and suffering.

¶29 *2. Whether the District Court correctly held that the Ranch could not ratify Kevin's conduct absent a "successful benefit" to the Ranch.*

¶30 On cross-appeal, Sherri argues that the District Court erred in granting the Ranch's motion for judgment as a matter of law because there did not need to be a showing of a "successful benefit" for Kevin's actions to be ratified by the Ranch. Pursuant to M. R. Civ. P. 50(a)(1), judgment as a matter of law in a jury trial is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue [.]" The court then may resolve the issue against the party and grant a motion for a judgment as a matter of law. M. R. Civ. P. 50(a)(1)(B).

¶31 Section 28-10-602, MCA addresses ratification of the wrongful acts of an agent:

(1) Unless required by or under the authority of law to employ that particular agent, a principal is responsible to third persons for the negligence of the principal's agent in the transaction of the business of the agency, including wrongful acts committed by the agent in and as a part of the transaction of business, and for the agent's willful omission to fulfill the obligations of the principal.

(2) A principal is not responsible for other wrongs committed by the principal's agent except those mentioned in subsection (1) unless the principal has authorized or ratified the acts, even though they are committed while the agent is engaged in the principal's service.

In *Safeco Ins. Co. v. Lovely Agency*, 200 Mont. 447, 453, 652 P.2d 1160, 1163 (1982), we established a three-part test to assess whether a principal has ratified the wrongful actions of an agent. Ratification exists upon the concurrence of three elements: (1) acceptance by the principal of the benefits of the agent's act; (2) with full knowledge of the facts and; (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized

arrangement. *Safeco Ins. Co.*, 200 Mont. at 453, 652 P.2d at 1163 (citation omitted). Sherri does not contest that the Ranch did not receive any benefit from Kevin kidnapping her. Thus, without an acceptance of the benefits of the act, there is no ratification as a matter of law.

¶32 In arguing that the District Court's order granting the Ranch's Rule 50 motion was incorrect, Sherri maintains that this Court has found that a principal can ratify the wrongful acts of its agent despite those acts not achieving their intended purpose. Additionally, she argues that the District Court's order is contrary to public policy because it shields principals from liability in the event of their agent's unsuccessful crimes. Finally, Sherri suggests the District Court should be reversed because there was sufficient evidence in the record for a reasonable jury to conclude that the Ranch ratified Kevin's actions.

¶33 In support, Sherri relies on *Daniels v. Dean*, 253 Mont. 465, 833 P.2d 1078 (1992). In *Daniels*, a group of business associates purchased property that was subject to an existing commercial lease. *Daniels*, 253 Mont. at 467, 833 P.2d at 1080. The lessee at the time of purchase operated a store on the leased premises. *Daniels*, 253 Mont. at 467-68, 855 P.2d at 1080. When the associates were unable to negotiate a termination of the lease, they began to interfere with the lessee's business. *Daniels*, 253 Mont. at 468, 833 P.2d at 1080-81. This included parking their cars immediately in front of the lessee's store to obstruct the entrance and take up customer parking, rejecting rent payments, and even entering the lessee's property to take measurements for placement of a garage door in the wall of the store. *Daniels*, 253 Mont. at 468, 833 P.2d at 1080-81. Eventually, tensions

20

escalated into a parking lot confrontation where the lessee testified the defendants swore at him and threatened to kill him. *Daniels*, 253 Mont. at 468, 833 P.2d at 1080-81. The defendants also threatened and frightened the lessee's patrons. *Daniels*, 253 Mont. at 468-69, 833 P.2d at 1080-81. At trial, the court found all defendants jointly and severally liable for breach of contract, malicious and intentional defamation, and tortious and intentional interference with the commercial lease. *Daniels*, 253 Mont. at 467, 833 P.2d at 1080.

¶34 On appeal, the business associate who had entered the lessee's store to take measurements for a garage door argued that there was not substantial evidence that he had knowledge of, planned, or personally took any action towards the lessee. *Daniels*, 253 Mont. at 470, 833 P.2d at 1082. This associate did not dispute the existence of an agency relationship with the other defendants. *Daniels*, 253 Mont. at 470, 833 P.2d at 1082. We applied § 28-10-602(2), MCA, as well as the three-part test from *Safeco*, and concluded that the associate clearly accepted the benefits of the attempts to induce the lessee to vacate the premises and terminate the lease, as he would not have entered the deal had he thought the lessee would remain. *Daniels*, 253 Mont. at 471-72, 833 P.2d at 1082-83 (citing *Safeco*, 200 Mont. at 447, 652 P.2d at 1163). Thus, the first element of ratification was satisfied.

¶35 Sherri interprets *Daniels* to mean that lack of a "successful benefit" does not preclude a finding that the first element of ratification has been established. She argues the District Court erred in tethering its Rule 50 order to a "successful benefit" requirement because it is inconsistent with *Daniels*. Sherri relies on language in *Daniels*, suggesting

that a principal may ratify "attempts" to confer a benefit. *Daniels*, 253 Mont. at 472-73, 833 P.2d at 1083. But *Daniels* did not dispense with the benefit element; rather, it recognized that a principal may accept the benefit of an act that was intended, though not entirely successful, to confer advantage. *Daniels*, 253 Mont. at 472-73, 833 P.2d at 1083. Here, Kevin's criminal conduct conferred no cognizable benefit on the Ranch. The Ranch's later decisions to post bail, pay some defense fees, and reemploy Kevin were independent corporate choices, not acceptance of any benefit flowing from the kidnapping itself. Because no benefit of the act existed for the Ranch to accept, the first element of ratification fails as a matter of law. The first *Safeco* element is "acceptance by the principal of the benefits of the agent's acts." *Safeco*, 200 Mont. at 453, 652 P.2d at 1163. In *Daniels*, we held that the business associate "clearly accepts the *benefits* of [a partner's] attempts to induce [the lessee] to vacate the lease satisfying the first element of ratification." *Daniels*, 253 Mont. at 471-72, 833 P.2d at 1082-83 (emphasis added). Section 28-10-602, MCA, and accompanying case law provides ratification cannot occur without the acceptance of benefits. Indeed, the acceptance of benefits is consistently treated as a fundamental requirement for ratification under Montana law. Sherri fails to identify any benefit the Ranch could have gained from the kidnapping.

¶36 It is also noteworthy that the jury found Kevin was not an agent of the Ranch. Without an agency relationship, either actual or ostensibly, ratification cannot occur because the foundational requirement of the agent acting on behalf of the principal is

absent.  *See Calkins v. Oxbow Ranch*, 159 Mont. 120, 126-27, 495 P.2d 1124, 1127 (1972).  Therefore, it would be improper to hold that the Ranch ratified Kevin's conduct.

## CONCLUSION

¶37     We affirm the District Court's order to grant Sherri a new trial on the basis that there was insufficient evidence to support the jury's verdict.  We also affirm the District Court's decision that the Ranch did not ratify Kevin's conduct.  This matter shall be set for a new trial on the issue of damages, the scope of which shall be determined by the District Court.  The Ranch is no longer a party in this matter.

¶38     Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ INGRID GUSTAFSON
/S/ KATHERINE M BIDEGARAY
/S/ BETH BAKER

23